MIDWEST SPORTS MARKETING,
INC., et al., Appellants,

v.

HILLERICH & BRADSBY OF CANADA,
LTD., et al., Respondents.

No. C1-96-6.

Court of Appeals of Minnesota.

July 16, 1996.

Review Denied Sept. 20, 1996.

Timothy R. Thornton, Eric J. Rucker, Briggs & Morgan, P.A., Minneapolis, for appellants.

Marko J. Mrkonich, Christine A. Kucera, Oppenheimer, Wolff & Donnelly, St. Paul, for respondents.

Before DAVIES, P.J., and HARTEN and WILLIS, JJ.

## OPINION

WILLIS, Judge.

Midwest Sports Marketing, Inc. (Midwest), Jerry Webb, and Leonard Payne appeal from summary judgment in favor of respondents Hillerich & Bradsby of Canada, Ltd. (H & B/Canada), Hillerich & Bradsby Co., Inc. (H & B/U.S.), and Christopher Sime.[1] H & B/Canada cross-appeals, challenging the constitutionality of the Minnesota Sales Representative Act as applied to its sales agency agreement with Midwest.

## FACTS

H & B/Canada entered into an exclusive sales agency agreement with Midwest in 1985. The agreement was to remain in effect for an indefinite period until terminated by either party upon 90 days' written notice to the other party. It designated Midwest as H & B/Canada's exclusive agent in a specified territory and authorized Midwest to solicit orders for H & B/Canada products in that territory. The agreement further provided that Midwest was responsible for hiring, compensating, and terminating any persons it engaged as subagents and provided that Minnesota law controlled any disputes relating to the agreement.

H & B/U.S. also entered into a sales representative agreement with Midwest in 1985. H & B/U.S. and Midwest entered into annual agreements, the last of which took effect on July 1, 1993. Each agreement was to remain in effect for one year unless terminated by either party upon 30 days' written notice. The agreement designated Midwest as the sales representative of H & B/U.S. for a specified territory and authorized Midwest to solicit orders for H & B/U.S. products in that territory. The agreement provided that Midwest had "complete charge" of any persons it engaged to solicit orders and that any such persons would be agents or employees of Midwest, not of H & B/U.S. It also provided that Kentucky law would control its interpretation and construction.

---

1. Where the record distinguishes between the two H & B entities, we refer to them as "H & B/Canada" and "H & B/U.S." Where the record does not distinguish between the two or refers to them collectively, we refer only to "H & B."

Appellant Jerry Webb was the sole owner of Midwest. He solicited orders for sporting goods, including H & B products, through Midwest and received his compensation from Midwest. Appellant Leonard Payne also solicited orders for sporting goods, including H & B products, through Midwest. As compensation, Leonard Payne received part of the commissions received by Midwest from manufacturers for his sales of sporting goods.

Respondent Christopher Sime signed a subagent agreement with Midwest approximately two weeks after he began working for Midwest in November 1993. The subagent agreement contained a noncompetition provision purporting to prohibit Sime from soliciting orders from any of Midwest's customers or on behalf of any company with which Midwest had an agency agreement for 48 months after termination of his relationship with Midwest. When Sime was hired, Webb told him that he would be required to sign a noncompetition agreement, but Webb did not disclose the terms to Sime until two weeks later. Steve Payne was also a subagent of Midwest, but he did not have a written agreement.

In April 1994, H & B informed Midwest that it was replacing its sales representatives with a salaried, in-house sales force. H & B intended to combine the sales representation of its hockey (H & B/Canada) and baseball/softball (H & B/U.S.) lines. H & B/U.S. subsequently hired respondent Sime and Steve Payne as in-house salespersons.

Midwest, Webb, and Leonard Payne sued H & B/U.S. and H & B/Canada alleging multiple claims, including age discrimination both in discharge and failure to hire and violations of the Minnesota Sales Representative Act. They also sued Sime for violation of the noncompetition agreement. The district court denied respondents' first motion for summary judgment. After the parties completed discovery, the district court granted summary judgment in favor of respondents and dismissed appellants' complaint in its entirety. This appeal followed.

## ISSUES

(1) Did the district court err by granting summary judgment on appellants' age discrimination/wrongful termination claims?

(2) Did the district court err by granting summary judgment on appellants' age discrimination/failure to hire claims?

(3) Did the district court err by granting summary judgment on appellants' claims under the Minnesota Sales Representative Act, Minn.Stat. § 325E.37?

(4) Is the Minnesota Sales Representative Act, Minn.Stat. § 325E.37, an unconstitutional impairment of an existing contract as it applies to H & B/Canada?

(5) Did the district court err by granting summary judgment on appellants' claim of breach of contract against Sime?

(6) Did the district court err by granting summary judgment on appellants' claims of breach of contract against H & B?

(7) Did the district court err by granting summary judgment on appellants' claims of tortious interference with contract?

(8) Did the district court err by granting summary judgment on appellants' claims of unfair competition?

(9) Did the district court err by granting summary judgment on appellants' claims of breach of an implied covenant of good faith and fair dealing?

(10) Did the district court err by granting summary judgment on appellants' claims of unjust enrichment?

## ANALYSIS

On appeal from summary judgment, this court determines if there are any genuine issues of material fact and if the district court erred in applying the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). Summary judgment for a defendant is appropriate as a matter of law "when the record reflects a complete lack of proof on an essential element of the plaintiff's claim." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn.1995). To avoid summary judgment, a nonmoving party "may not rest upon the mere averments or denials of

[that] party's pleading but must present specific facts showing that there is a genuine issue for trial." *Minn. R. Civ. P. 56.05.*

## (1) Age Discrimination/Wrongful Discharge

### a. Employer/Employee Relationship

■ The Minnesota Human Rights Act (MHRA) prohibits an employer from discharging an employee on the basis of age.[2] Minn.Stat. § 363.03, subd. 1(2)(b) (1994). The MHRA defines "employee" to include a person "who is employed by an employer and who resides or works in this state." Minn. Stat. § 363.01, subd. 16 (1994). The district court held that Webb and Leonard Payne were not employees of H & B.

■ In determining the existence of an employment relationship under the MHRA, Minnesota courts consider five factors: (1) the right to control the means and the manner of performance, (2) the mode of payment, (3) the furnishing of materials or tools, (4) the control of the premises where the work is done, and (5) the employer right to discharge. *State by Johnson v. Porter Farms,* 382 N.W.2d 543, 549 (Minn.App.1986). The most important factor "is the right, not just the exercise, of the employer to control the details of the work." *Hunter v. Crawford Door Sales,* 501 N.W.2d 623, 624 (Minn.1993).

■ Appellants, citing *Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775 (1975), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976), argue that the question of whether an individual is an employee is a question of fact for the jury. In *Wild,* the supreme court held that the district court improperly removed the employment status issue from the jury by instructing the jury that respondent was not an employee of appellants. *Id.* at 438–39, 234 N.W.2d at 788–89. *Wild,* however, involved a motion for a new trial, not a motion for summary judgment as in this case. At the summary judgment stage, a reviewing court must determine if the evidence in the record, viewed in the light most favorable to the party against whom judg-

ment was granted, is sufficient to raise a genuine issue of material fact regarding the essential elements of that party's claims. *Lubbers,* 539 N.W.2d at 401. Here, therefore, we must review the evidence in the light most favorable to appellants to determine whether that evidence raises a genuine issue of material fact regarding whether appellants were employees of H & B.

Appellants argue that the following facts in the record show respondents' right to control and exercise of control over the means and manner of appellants' performance: (1) H & B required appellants to use H & B order forms when placing orders with H & B; (2) H & B/U.S. at least twice told appellants to call on certain accounts (although on one of those occasions appellants did not comply with H & B's request); (3) H & B asked appellants to "try to show [customer representatives] the [product] line prior to the [sports] show"; (4) H & B/U.S. required appellants to fill out a report after each sales call on H & B customers; (5) appellants sent monthly itineraries to H & B for approval; (6) appellants filled out a customer specification sheet for each new H & B/U.S. customer; (7) H & B suggested that appellants should check their H & B voice mail messages on a daily basis; (8) Webb traveled to H & B sales meetings; (9) H & B/Canada asked Webb to be a member of a product development committee, for which he received no compensation other than reimbursement of travel expenses; (10) Leonard Payne and Webb went to H & B/Canada product development meetings; (11) appellants participated in two sales team teleconferences regarding product lines and did not think they could object to participating in the sales team; (12) H & B required appellants to conduct sales clinics; (13) H & B asked appellants to spend time in the H & B booth at sports shows; and (14) H & B required Webb and Leonard Payne to follow the instructions in the H & B sales manual.

The evidence cited by appellants shows that H & B/Canada and H & B/U.S. monitored the quality of representation their

---

**2.** The MHRA provides that "[t]he prohibition against unfair employment * * * practices based on age prohibits using a person's age as a basis

for a decision if the person is over the age of majority * * *." Minn.Stat. § 363.01, subd. 3 (1994).

product lines were receiving; it does not show that they controlled the means and the manner of appellants' performance in soliciting orders. The isolated incidents in which H & B asked appellants to visit certain accounts do not establish the continuing control common in employment relationships. Similarly, H & B's requirements regarding the use of H & B forms and the submission of reports and itineraries to H & B do not indicate that H & B controlled the manner in which appellants solicited orders for H & B products. Finally, the record does not show to what extent the sales manual instructions controlled the means and manner in which appellants performed. In sum, the facts cited by appellants are not sufficient to constitute the control of the means and manner of appellants' performance that establishes an employment relationship.

Further, the record does not show that H & B/Canada or H & B/U.S. had any *right* to control the means and manner of appellants' performance. The sales representative agreements in effect at the time of the termination stated that Midwest had "complete charge of any persons engaged by [Midwest] in the solicitation of orders for the purchase of Products" and that Midwest was "solely responsible for hiring, compensating and terminating any person it may employ as subagents within its district." Webb and Leonard Payne were persons engaged by Midwest and, therefore, *Midwest* had the exclusive right to control their actions.

Appellants assert that an employment relationship existed because H & B controlled Midwest's hiring decisions by refusing to approve the hiring of a Midwest subagent. Again, the record does not show that H & B/Canada or H & B/U.S. had a ***right*** to control Midwest's hiring decisions; by contract Midwest had "complete charge" of and was "solely responsible" for the persons it hired as subagents.

Consideration of the remaining four factors relevant to determining whether an employment relationship exists for purposes of the MHRA also does not raise a genuine issue of material fact regarding whether appellants were employees of either H & B/U.S. or H & B/Canada. The record shows that Webb and Leonard Payne never received payment from H & B and that all commissions were earned by Midwest and were paid by H & B to Midwest. The record shows that H & B provided appellants with promotional materials, catalogs, and administrative forms; the record does not show that H & B provided appellants with materials or tools used to solicit orders, such as vehicles, or that H & B paid the travel expenses incurred by appellants in soliciting orders. The record does not show that H & B controlled the premises where appellants solicited orders. Finally, H & B did not have a right to discharge Webb or Leonard Payne; H & B only had a right to terminate its contract with Midwest, which in turn had complete control over Webb and Leonard Payne. Viewing the facts in the light most favorable to appellants, we hold that the record fails to raise a genuine issue of material fact regarding whether Webb and Leonard Payne were employees of either H & B/Canada or H & B/U.S.

### b. Commission Salespersons

In addition to a person "employed by an employer," the MHRA defines "employee" to include a person who is "a commission salesperson, as defined in section 181.145, who resides or works in this state." Minn. Stat. § 363.01, subd. 16. Section 181.145 defines "commission salesperson" as "a person who is paid on the basis of commissions for sales and who * * * is an independent contractor." Minn.Stat. § 181.145, subd. 1 (1994). Appellants argue that if they are not employees of H & B, then they are commission salespersons of H & B.

Appellants argue that because the statute does not specify that they must receive commissions directly from the principal for whom they claim to be commission salespersons, this court should disregard the evidence that they never received commissions from H & B. They argue that Leonard Payne was a commission salesperson because he was paid on a commission basis by Midwest for his H & B sales and that Webb was a commission salesperson because his salary as owner of Midwest was dependent on H & B commissions. Appellants' construction of section

181.145, however, ignores the remainder of the statute. Implicit throughout the statute is the notion that the salesperson is paid *by the principal* on the basis of commissions. Although Webb and Leonard Payne may have been commission salespersons with respect to Midwest, they were not commission salespersons of H & B, from which they never received commissions.

■ Appellants argue alternatively that Midwest is a commission salesperson and that the MHRA applies to Midwest. Although appellants admit that H & B could not have discriminated against Midwest on the basis of its age, they argue that Midwest has standing to assert Webb and Leonard Payne's age discrimination claims because Midwest was harmed by H & B's actions. To support their position, appellants cite *Gersman v. Group Health Ass'n,* 931 F.2d 1565, 1568–69 (D.C.Cir.1991), *vacated on other grounds,* 502 U.S. 1068, 112 S.Ct. 960, 117 L.Ed.2d 127 (1992). In *Gersman,* the court held that a shareholder did not have standing to bring a civil rights claim against Group Health because he did not suffer any injury when Group Health, allegedly on the basis of Gersman's religious affiliation, cancelled a contract with the corporation in which Gersman owned stock. *Id.* at 1569. Nevertheless, the court held that the corporation had standing because it was injured by Group Health's alleged violation of Gersman's civil rights. *Id.* at 1569–70. We note that *Gersman* is the opinion of a foreign jurisdiction, and the supreme court has not yet addressed the issue of when a third party can bring a claim under the MHRA on behalf of a party who is otherwise unable to do so. We decline to adopt the *Gersman* reasoning in this case.

We hold that Webb and Leonard Payne did not raise genuine issues of material fact regarding whether they were employees or commission salespersons of H & B under the MHRA. Further, Midwest cannot sustain a claim under the MHRA because H & B could not have discriminated against Midwest on the basis of its age. Because of our holdings on these issues, we need not decide whether appellants have established a prima facie case of age discrimination.[3]

## (2) Age Discrimination/Failure to Hire

■■ The Minnesota Human Rights Act provides that it is an unfair employment practice for an employer, because of age, "to refuse to hire or to maintain a system of employment which unreasonably excludes a person seeking employment." Minn.Stat. § 363.03, subd. 1(2)(a). A plaintiff establishes a prima facie case of discriminatory failure to hire by showing that (1) he or she belongs to a protected class, (2) he or she applied and was qualified for the job for which the employer was seeking applicants, (3) despite his or her qualifications, he or she was not hired for the position, and (4) the position remained available or was filled by someone else with similar qualifications. *Sigurdson v. Carl Bolander & Sons, Co.,* 532 N.W.2d 225, 228 (Minn.1995). The district court held that appellants failed to provide evidence of the second prong of the test because the record shows that they never applied to be defendants' salaried sales employees.

Appellants argue that the record shows that they "applied" for in-house sales positions when Webb told H & B's Jay Strange and Marty Archer that Webb and Leonard Payne wanted to continue to represent H & B products in "any capacity." The record also shows that Webb told Archer that he wanted to be considered for a factory sales employee representative position. The record does not show that Webb or Leonard Payne ever formally applied to work for H & B. The only written correspondence from Webb or Leonard Payne regarding continuation of their relationship with H & B is a letter in which Webb argued that H & B should not switch to an in-house sales force. We conclude that, as a matter of law, Webb's alleged statements to Strange and Archer

---

**3.** In their brief, appellants state that summary judgment is generally not appropriate in age discrimination cases. The supreme court recently expressed its disapproval of the "sweeping statement that summary judgment is generally inappropriate in discrimination cases." *Dietrich v. Canadian Pacific,* 536 N.W.2d 319, 326 n. 9 (Minn.1995). The court stated that "[t]his is not the law in Minnesota." *Id.*

did not constitute an "application" for the position. Further, the record does not show that H & B ever sought applicants for the position of in-house salesperson.

### (3) Minnesota Sales Representative Act Claims Against H & B/Canada

Appellants seek damages and injunctive relief from H & B/Canada under the Minnesota Sales Representative Act (MSRA), Minn.Stat. § 325E.37 (1994).[4] They claim that H & B/Canada failed to give them timely written notice of the termination of their sales representative agreement, failed to provide notice to cure any grounds constituting cause for termination, failed to terminate the agreement for good cause, failed to state the cause for termination, and failed to pay all commissions due under the sales representative agreement.

To gain the protection of the MSRA, appellants must be "sales representatives" as defined by Minn.Stat. § 325E.37, subd. 1(d), which states:

"Sales representative" means a person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission.

Sales representative does not include a person who:

(1) is an employee of the principal;

(2) places orders or purchases for the person's own account for resale;

(3) holds the goods on a consignment basis for the principal's account for resale; or

(4) distributes, sells, or offers the goods, other than samples, to end users, not for resale.

Appellants argue that Webb, Leonard Payne, and Midwest are sales representatives of H & B/Canada under the statute.

■ The record shows that the sales agency agreement was between H & B/Canada and Midwest. There is no evidence that H & B/Canada ever entered into a contract, express or implied, written or oral, with either Webb or Leonard Payne. Appellants

argue that the control exercised by H & B/Canada over their work constitutes evidence of an implied contract. Although control may be relevant to their status as employees, appellants provide no legal authority for their position that H & B/Canada's alleged control over them establishes a contractual relationship. We hold that Webb and Leonard Payne were not sales representatives of H & B/Canada under the MSRA because they did not contract with H & B/Canada to solicit wholesale orders.

■ Appellants argue that Midwest was a sales representative under the MSRA. Under the MSRA, a person who "places orders or purchases for the person's own account for resale" is not a sales representative. Minn. Stat. § 325E.37, subd. 1(d)(2). The district court concluded that Midwest was not a sales representative because 70% of Midwest's income was generated by Midwest's sales of products it purchased for resale. The district court did not, however, address whether Midwest ordered or purchased goods *from H & B/Canada* for resale. Webb testified that Midwest never purchased anything from H & B/Canada for resale. As a result, a genuine issue of material fact remains regarding whether Midwest is excepted from being a sales representative of H & B/Canada under the MSRA on the ground that it "places orders or purchases for [its] own account for resale." Minn.Stat. § 325E.37, subd. 1(d)(2).

The district court also held that Midwest was not a sales representative under the MSRA because Midwest held substantial amounts of H & B/Canada goods on consignment from 1988 through 1994. Webb testified that Midwest did not hold H & B goods on consignment after 1993. Webb's testimony creates a fact question regarding whether Midwest held H & B consignment goods at the time H & B/Canada terminated its agreement with Midwest in April 1994.

■ H & B/Canada argues that Midwest is not a sales representative because the record undisputedly shows that Midwest held

---

4. Appellants also sought relief from H & B/U.S. under the MSRA, but the district court held that the choice of law provision in the sales agreement between H & B/U.S. and Midwest precluded application of the MSRA to H & B/U.S. Appellants do not appeal that part of the district court's order.

consignment goods until 1993. This argument, however, misconstrues the nature of the MSRA. The statute provides remedies to sales representatives for violations of the statute's provisions regarding termination of sales representative agreements. Accordingly, the essential inquiry is whether the person claiming to be a sales representative was a sales representative when the principal terminated the sales representative agreement. It is irrelevant whether the person was a sales representative of the principal in the past. Further, the statute precludes a person from being a sales representative if he or she "holds," not "held," goods on a consignment basis. Minn.Stat. § 325E.37, subd. 1(d)(3).

In sum, the record does not present a fact question regarding whether Webb and Leonard Payne were sales representatives of H & B/Canada under the MSRA. The record does present fact questions, however, regarding whether Midwest was an H & B/Canada sales representative at the time H & B/Canada terminated its agreement with Midwest. Summary judgment, therefore, is not appropriate with regard to Midwest's claim against H & B/Canada under the MSRA.

### (4) Constitutionality of the MSRA as Applied to H & B/Canada

■ H & B/Canada argues that the MSRA violates the contract clauses of the United States and Minnesota Constitutions. H & B/Canada argues that its contract with Midwest existed at the time the legislature passed the MSRA and that the contract is unconstitutionally impaired by the MSRA.

■ Every statute is presumed to be constitutional, and the party challenging a statute must demonstrate beyond a reasonable doubt that a statute violates a constitutional provision. *Jacobsen v. Anheuser–Busch,* 392 N.W.2d 868, 872 (Minn.1986), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 941, 93 L.Ed.2d 991 (1987). The United States Constitution provides that "[n]o [s]tate shall * * * pass any * * * [l]aw impairing the [o]bligation of [c]ontracts." U.S. Const. art. 1, § 10. Similarly, the Minnesota Constitution provides that "[n]o * * * law impairing the obligation

of contracts shall be passed." Minn. Const. art. I, § 11.

Appellants argue that this court has already ruled on the constitutionality of the MSRA in *New Creative Enters. v. Dick Hume & Assocs.,* 494 N.W.2d 508 (Minn.App. 1993), *review denied* (Minn. Mar. 16, 1993). In *New Creative Enters.,* however, this court addressed only a due process challenge to a provision in the original statute that precluded judicial review. *Id.* at 511. The court did not directly address a Contract Clause challenge to the application of the statute.

■ In evaluating a Contract Clause question, courts must determine (1) if a contractual relationship exists, (2) if the challenged change in the law impairs that relationship, and (3) if the impairment is substantial. *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992). If the court determines that the challenged change in state law has operated as a substantial impairment of a contractual relationship, the state must demonstrate a significant and legitimate public purpose for the regulation. *Energy Reserves Group v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983).

In this case, the existence of a contractual relationship is clear: The parties entered into the sales agency agreement in 1985, five years before the legislature enacted the MSRA. H & B/Canada argues that the MSRA impairs its contractual relationship by imposing a "good cause" requirement for termination of sales representatives. A closer reading of the statute, however, shows that in this instance the statute does not require "good cause" for H & B/Canada to terminate its relationship with Midwest.

Subdivision 3 of the MSRA permits non-renewal of a sales representative agreement, without cause, if the sales representative receives "written notice of the intention not to renew at least 90 days in advance of the expiration of the agreement." Minn.Stat. § 325E.37, subd. 3. However, subdivision 3 also states that

[f]or purposes of this subdivision, a sales representative agreement of indefinite du-

ration shall be treated as if it were for a definite duration expiring 180 days after the giving of written notice of intention not to continue the agreement.

*Id.* Consequently, subdivision 3 permits a principal to end a sales representative agreement of indefinite duration, without cause, by giving 180 days' written notice.

The sales representative agreement between H & B/Canada and Midwest was for an indefinite period. H & B/Canada gave Midwest written notice of its intention not to continue the agreement on May 3, 1994. The agreement, therefore, must be treated as if it were for a definite duration expiring 180 days after May 3, 1994. The only additional requirement imposed on H & B/Canada by the MSRA is a 180–day notice period, rather than the 90–day termination period contained in the contract.

While the additional notice requirement arguably may impair H & B/Canada's contractual relationship with Midwest, any impairment is not substantial. The agreement already required H & B/Canada to give notice of its intention to terminate. The statute merely requires a 90–day longer notice period. Because the statute does not substantially impair H & B/Canada's contract with Midwest, we need not decide if the state has a significant and legitimate public purpose for the legislation.

## (5) Breach of Contract Claim Against Sime

Appellants argue that the district court erred by concluding that Midwest's noncompetition agreement with Sime fails for lack of consideration. They also argue that the district court erred by concluding that Midwest is estopped from enforcing the noncompetition agreement against Sime.

 Minnesota courts do not favor noncompetition agreements because they are partial restraints on trade. *National Recruiters v. Cashman*, 323 N.W.2d 736, 740 (Minn.1982); *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn.App.1993). A noncompetition agreement must be supported by independent consideration if it is not ancillary to an employment contract. *Sanborn*,

500 N.W.2d at 164. This court explained in *Sanborn* that the independent consideration requirement

> reflects the fact that employers and employees have unequal bargaining power. When the employer fails to inform prospective employees of noncompetition agreements until after they have accepted jobs, the employer "takes undue advantage of the inequality between the parties."

*Id.* (quoting *National Recruiters*, 323 N.W.2d at 741). Minnesota courts evaluate the facts of each case to determine the adequacy of consideration for noncompetition agreements entered into during employment relationships. *Freeman v. Duluth Clinic*, 334 N.W.2d 626, 630 (Minn.1983). Continuation of employment can be sufficient consideration if the agreement is bargained for and provides the employee with "real advantages." *Id.*

In *Davies & Davies Agency v. Davies*, 298 N.W.2d 127 (Minn.1980), Robert Buckingham knew before he began his employment that he would be required to sign a noncompetition agreement, but he was not aware of the terms of the agreement. *Id.* at 132–33. The employer did not show Buckingham the agreement or ask him to sign it until 11 days after he began working. *Id.* The supreme court held that Buckingham's continued employment alone was not sufficient consideration to support the agreement and that the agreement was "invalid and unenforceable." *Id.* at 133. With regard to another employee, Richard Davies, the supreme court found that sufficient consideration existed where the employer continued Mr. Davies's employment for 10 years, advanced him within the agency to a position that would have been unavailable if he had not signed the agreement, provided him informal training, provided him support in his insurance license applications, and gave him sole responsibility for many of the agency's customers. *Id.* at 131.

 The record in this case shows that Sime knew before he began working that he would be required to sign a noncompetition agreement, but that he was not aware of the terms of the agreement until Webb presented it to him at least two weeks after he began working for Midwest. The record

does not show that Midwest provided Sime any independent consideration for signing the noncompetition agreement. The record does not show that Sime received any real advantages from signing the agreement that would not have been available to him if he had not signed it. Rather, the record shows that Midwest did not make any distinction between Sime and Steve Payne, who was not required to sign a noncompetition agreement. *See Freeman,* 334 N.W.2d at 630 (holding that a noncompetition agreement was not valid, in part, because "[a]bsolutely no distinction was made between signers and non-signers").

Because the record shows that Sime received only a promise of employment and did not gain any real advantages by signing the noncompetition agreement after he started his employment with Midwest, we hold that the noncompetition agreement fails for lack of consideration. Because the agreement is invalid, we need not decide whether Midwest waived its right to enforce the agreement or was estopped from enforcing the agreement.

**(6) Breach of Contract Claims Against H & B**

**a. Commissions on H & B/U.S. Sales to Target Stores**

■ Appellants argue that the district court erred by concluding that appellants were not entitled to commissions from sales to Target stores that took place after July 1, 1993. The 1993–94 sales representative agreement between H & B/U.S.[5] and Midwest, which became effective on July 1, 1993, contains the following provision:

> Subject to the other terms and conditions hereof, H & B hereby designates [Midwest] as its sales representative to solicit orders for the Products from Customers, assigned as of this date or assigned as of a subsequent date (not including "Key or House" accounts serviced from H & B's home office) * * *.

The record contains Webb's undisputed testimony that he was told before signing the

1993–94 sales representative agreement that Target had been made a house account that would be serviced from H & B/U.S.'s home office. As a result, the Target account was not assigned to Midwest as of the date of the agreement and was a "Key or House" account specifically excluded from Midwest's 1993–94 sales representative agreement. The district court did not err by granting summary judgment on appellants' breach of contract claim for commissions on sales of H & B/U.S. products to Target stores.

**b. Other Breach of Contract Claims Against H & B**

**(i) Claims Against H & B/U.S.**

■ Appellants argue that H & B/U.S. breached its sales representative agreement with Midwest by unilaterally removing the Target account from Midwest and by interfering with Midwest's right to hire subagents autonomously. The sales representative agreement did not require H & B/U.S. to get Midwest's permission before changing an account from outside representation to a "Key or House" account that is serviced by the H & B/U.S. home office. Similarly, the sales representative agreement did not prohibit H & B/U.S. from making suggestions to Midwest regarding Midwest's employment of subagents. Summary judgment, therefore, is appropriate on these breach of contract claims against H & B/U.S.

**(ii) Claims Against H & B/Canada**

Appellants argue that H & B/Canada breached its sales agency agreement with Midwest in five ways. First, appellants argue that H & B/Canada failed to pay commissions due on sales to WalMart. Appellants do not point to anything in the record supporting this claim and the record is devoid of any evidence regarding WalMart. The district court properly granted summary judgment on this claim.

■ Second, Midwest argues that H & B/Canada breached the sales agency agreement by interfering with Midwest's contractual right to hire subagents. The record

---

**5.** Appellants do not claim that they are entitled to commissions from H & B/Canada for sales to Target.

shows that Jay Strange, sales manager for H & B/U.S., wrote a letter to Midwest in which he stated that it was "presumptive" of Midwest to hire a subagent without approval from H & B/U.S. Because Strange was a sales manager for H & B/U.S., not H & B/Canada, this incident does not support a claim against H & B/Canada. The record also shows that Midwest "was only allowed to hire Steve Payne after receiving H & B's approval" and that Midwest "was only allowed to hire sub-agent Chris Sime on the condition he only sell H & B/Canada hockey products." Even if these statements were true, Midwest's agreement with H & B/Canada provides that Midwest was solely responsible for hiring subagents. It did not impose a duty on H & B/Canada to refrain from expressing its opinion to Midwest about Midwest's decisions regarding subagents. Summary judgment is appropriate on this breach of contract claim.

Third, Midwest argues that H & B/Canada breached its sales agency agreement by hiring Midwest subagents Steve Payne and Sime within two years after the end of their employment with Midwest. The agreement prohibits H & B/Canada from employing or contracting with a subagent that Midwest has terminated. The record undisputedly shows, however, that Steve Payne and Sime were hired by H & B/U.S. Summary judgment, therefore, is appropriate on this breach of contract claim.

■ Fourth, appellants argue that H & B/Canada breached the sales agency agreement by failing to inform Midwest of shortages in product. The agreement provides that H & B/Canada was required to "keep [Midwest] informed of all difficulties in completing orders." The record contains evidence that H & B/Canada failed to warn Midwest of upcoming shortages in merchandise. Appellants have not pointed to evidence in the record, however, showing that they suffered damages caused by H & B/Canada's failure to warn Midwest of merchandise shortages. Summary judgment, therefore, is appropriate. *See Lubbers,* 539 N.W.2d at 401 ("A defendant is entitled to summary judgment as a matter of law when the record reflects a complete lack of proof on an essential element of the plaintiff's claim.").

■ Fifth, appellants argue that H & B/Canada breached the sales agency agreement by failing to give Midwest 90 days' notice of termination. The contract requires 90 days' written notice of termination by either party. The record shows that H & B/Canada gave Midwest written notice of termination of the sales representative agreement on May 3, 1994, and paid Midwest for commissions through June 30, 1994. The record shows, therefore, that Midwest did not receive commissions it would have received under the contract from June 30, 1994, until the end of the 90-day notice term required by the contract. Summary judgment is not appropriate on this claim of breach of contract.

**(7) Tortious Interference with Contract**

■ A plaintiff must prove five elements to establish a claim for tortious interference with contract: (1) the existence of a contract, (2) knowledge of the contract by the alleged wrongdoer, (3) intentional procurement of its breach, (4) no justification for the interference, and (5) damages. *Kjesbo v. Ricks,* 517 N.W.2d 585, 588 (Minn.1994); *Singleton v. Christ the Servant Evangelical Lutheran Church,* 541 N.W.2d 606, 614 (Minn.App. 1996), *review denied* (Minn. Mar. 19, 1996). Midwest argues that H & B interfered with the alleged noncompetition agreement between Sime and Midwest. Because we hold that the noncompetition agreement fails for lack of consideration, appellants' tortious interference with contract claim fails under the first prong of the *Kjesbo* test.

**(8) Unfair Competition**

■ Unfair competition is a general category of torts recognized by Minnesota courts to protect commercial interests. *Rehabilitation Specialists v. Koering,* 404 N.W.2d 301, 305 (Minn.App.1987). Unfair competition can include tortious interference with contract, improper use of trade secrets, and an employee's breach of a duty of loyalty to his or her employer. *United Wild Rice v. Nelson,* 313 N.W.2d 628, 632 (Minn.1982); *Rehabilitation Specialists,* 404 N.W.2d at 306.

Appellants argue that respondents (1) took "advantage" of Midwest "by using [Midwest] for a training ground for Sime and Steve Payne," (2) "confiscated" their business by changing to an in-house sales force, (3) "fired" them without good cause and because they were "too old for the job," and (4) "usurped [Midwest]'s lucrative WalMart and Target accounts." Appellants do not point to any evidence in the record supporting these claims. *See* Minn. R. Civ. P. 56.05 (stating that a party opposing summary judgment "must present specific facts showing that there is a genuine issue for trial"). Even if the record contained evidence substantiating appellants' allegations, the alleged acts complained of are not the types of conduct that Minnesota courts have recognized as actionable forms of unfair competition. *See United Wild Rice*, 313 N.W.2d at 632; *Rehabilitation Specialists*, 404 N.W.2d at 306. Summary judgment, therefore, is appropriate on appellants' claims of unfair competition.

### (9) Breach of Implied Covenant of Good Faith and Fair Dealing

In Minnesota, "every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.1995) (citing *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn.1984)). *But see Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn.1986) (holding that Minnesota law does not recognize implied covenants of good faith and fair dealing in employment contracts). Appellants base their claim of breach of implied covenant of good faith and fair dealing on the same facts on which they base their claims of breach of contract, tortious interference with contract, and unfair competition. Appellants point to no specific facts in the record that show respondents acted in bad faith or respondents' actions hindered appellants' performance of their contract. Summary judgment, therefore, is appropriate on this claim. *See* Minn. R. Civ. P. 56.05 (stating that a party opposing summary judgment "must present specific facts showing that there is a genuine issue for trial").

### (10) Unjust Enrichment

A claim for unjust enrichment arises when a party gains a benefit illegally or unlawfully. *Holman v. CPT Corp.*, 457 N.W.2d 740, 745 (Minn.App.1990), *review denied* (Minn. Sep. 20, 1990). An unjust enrichment claim

> may be founded upon failure of consideration, fraud, or mistake, or "situations where it would be morally wrong for one party to enrich himself at the expense of another."

*Id.* (citing *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn.App.1984), *review denied* (Minn. Nov. 8, 1984)). However, "equitable relief cannot be granted where the rights of the parties are governed by a valid contract." *U.S. Fire Ins. Co. v. Minnesota State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn.1981). Even so, if the contract is not a "full agreement concerning the details of compensation," a party may recover on an unjust enrichment claim. *Holman*, 457 N.W.2d at 745.

In this case, the rights of the parties were governed by valid contracts. The contracts fully detailed Midwest's compensation for performance of its duties. The H & B/Canada sales representative agreement included a provision for commissions on sales. The H & B/U.S. sales representative agreement included a section regarding compensation and a section titled "Required Duties Other Than Direct Selling Duties," which required Midwest to be responsible for expenses associated with sales meetings, clinics, customer shows, sporting goods association shows, and presentations to schools and coaches. The H & B/U.S. agreement also required Midwest to provide H & B/U.S. information regarding customers, competition, and the industry. Because the rights of the parties were governed by a valid contract, appellants' unjust enrichment claims fail and summary judgment is appropriate.

### DECISION

Summary judgment for respondents is appropriate on appellants' claims of age dis-

crimination/wrongful discharge, age discrimination/failure to hire, breach of contract against Sime, breach of contract against H & B/U.S., tortious interference with contract, unfair competition, breach of implied covenant of good faith and fair dealing, and unjust enrichment. Summary judgment for respondents also is appropriate on appellants' breach of contract claims against H & B/Canada, except their claim that H & B/Canada failed to give Midwest 90 days' notice of termination of the sales agency agreement. Summary judgment for respondents is appropriate on Webb and Leonard Payne's claims under the Minnesota Sales Representative Act, but not appropriate on Midwest's claim against H & B/Canada under the Act. Finally, the Minnesota Sales Representative Act does not unconstitutionally impair H & B/Canada's contract with Midwest. We remand the issues of H & B/Canada's failure under the contract to give Midwest 90 days' notice of termination and H & B/Canada's alleged violation of the Minnesota Sales Representative Act with regard to Midwest.

**Affirmed in part, reversed in part, and remanded.**